FILED

2021 Jan-29  AM 09:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ARNOLD PATRICK LEAK,** | ) | |
| **KAREN LEAK,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.: 5:17-cv-01890-MHH** |
| **v.** | ) | |
| | ) | |
| **OCWEN LOAN SERVICING, LLC,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case arises out of defendant Ocwen's foreclosure sale of property in Cullman County, Alabama.  The mortgagors, Arnold Patrick Leak and Karen Leak, filed this lawsuit after their mortgage loan was foreclosed, and the family property was sold to a third party.  The Leaks allege that Ocwen and its co-defendant, Deutsche Bank, violated the Real Estate Settlement Procedures Act (RESPA), a federal statute, and several state laws.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Ocwen and Deutsche Bank have asked the Court to enter judgment in their favor on each of the Leaks' claims.  (Doc. 26).  For the reasons explained below, the Court grants the defendants' motion.

1

## I.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party.  *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018).  Accordingly, the Court views the evidence in the light most favorable to the Leaks.

## II. SUMMARY JUDGMENT EVIDENCE

The property at issue is 34 acres of farmland and a house that has been in Mr. Leak's family for years.  (Doc. 26-28, p. 24, tp. 86; Doc. 26-29, p. 32, tpp. 120–21). Mr. Leak visited the property often as a child, and he took pride in the family-owned property.  (Doc. 26-29, p. 32, tpp. 120–21; Doc. 26-29, p. 26, tp. 94).  The Leaks

2

bought the property from Mr. Leak's parents' estate in 2003.  (Doc. 26-29, p. 12, tpp. 39–40).  The property was not the Leaks' primary residence; they lived in Destin.  (Doc. 26-28, p. 24, tp. 89).

The Leaks listed the property for sale several times.  (Doc. 26-28, pp. 21–25, tpp. 75–91).  In 2003, the Leaks listed the property for sale for $689,900.00.  (Doc. 26-28, p. 23, tp. 82).  In 2005, the Leaks listed the property for sale for $ 1 million. (Doc. 26-28, p. 23, tp. 83).  In 2008, the Leaks listed the property for sale for $999,000.00.  (Doc. 26-28, p. 23, tp. 84).  At some point, the City of Good Hope offered to buy the property for $250,000, but the Leaks rejected the offers because the Leaks' realtor believed the property "was worth much more than that."  (Doc. 26-28, pp. 21–22, 24, tpp. 77, 79, 87; *see also* Doc. 26-29, p. 21, tpp. 76-77).  The Leaks negotiated a Lease to Purchase Option Agreement to sell the house and one acre of property for $120,000 in 2008, but the agreement fell through.  (Doc. 26-28, p. 24, tpp. 87–89).  Though the Leaks listed the property for sale, Mr. Leak testified that he and his wife intended to retire to the property.  (Doc. 26-29, p. 6, tpp. 16–17).

On June 12, 2004, the Leaks refinanced the property by executing a mortgage agreement with Ameriquest Mortgage Company for a principal amount of $91,650.00.  (Doc. 26-2).  The mortgage was assigned to Deutsche Bank National Trust Co., as Trustee for Ameriquest Mortgage Securities, Inc., Asset-Backed  Pass-

Through Certificates, Series 2004-R8 effective January 15, 2009.   (Doc. 26-4). Ocwen Loan Servicing, LLC was the servicer for the Leaks' loan.  (Doc. 26-5).

The Leaks fell behind on their mortgage payments several times.  In 2009, the Leaks entered into a loan modification agreement to help them cure their arrearages. (Doc. 26-7).  Still, the Leaks were unable to stay current on their mortgage payments. Consequently, the Leaks signed two forbearance agreements—one in July of 2012 and one in October of 2012.  Under both agreements, the Leaks agreed to make higher monthly payments to catch up on their mortgage.  (Doc. 26-8; Doc. 26-9).  In October of 2014, the Leaks signed another loan modification agreement.  (Doc. 26-10).

On April 21, 2015, Ocwen advised the Leaks that they were in default again. (Doc. 26-11).  The notice encouraged the Leaks to inquire about loan modification and other loan counseling services to help them avoid foreclosure.  (Doc. 26-11, pp. 8–10).  A few months later, on July 2, 2015, Ocwen's foreclosure attorney sent the Leaks notice of acceleration and informed the Leaks that the amount due was just over $89,000.  Ocwen's attorney indicated that Ocwen had instructed him to begin foreclosure proceedings.  (Doc. 26-12).  Ocwen's attorney concluded: "Should you wish to have the foreclosure proceedings discontinued, all sums due under your loan with Deutsche Bank must be paid to the in certified funds."  (Doc. 26-12, p. 2).

4

On September 10, 2015, Ocwen's foreclosure attorney sent another letter to the Leaks, this one enclosing a "Notice of Foreclosure Sale" which stated that the Leaks' property would be sold on October 7, 2015. (Doc. 26-13, p. 3). The cover letter provided:

> If you wish to obtain a payoff of the subject loan, or a reinstatement amount to bring the loan current, please contact this firm at least 10 days before the scheduled sale date. However, the Foreclosure sale will not be canceled or postponed while your request is pending.

(Doc. 26-13, p. 2) (emphasis in letter). The foreclosure sale notice appeared in the Cullman Times newspaper for three consecutive weeks in September of 2015. (Doc. 26-30). The foreclosure sale went forward on October 7, 2015, and the property was sold to a third party for $93,211.90, an amount that extinguished the Leaks' loan. (Doc. 26-21).

Several months before the foreclosure sale, during the summer of 2015 (Doc. 26-15, pp. 16, 24, 29), the Leaks had begun the process of requesting mortgage assistance from Ocwen, (Doc. 26-15, pp. 9–33). In their application materials, the Leaks indicated that the property was valued at $160,000. (Doc. 26-15, p. 13). On July 28, 2015, Ocwen informed the Leaks that their application was under review. Ocwen asked the Leaks to submit tax returns, bank statements, and paystubs by August 21, 2015 to support Ocwen's review of the application. (Doc. 26-16, pp. 2-3). Ocwen sent a second copy of the request to the Leaks on July 31, 2015. (Doc. 26-17). Mr. Leak testified that he sent the requested documents to Ocwen, but he

did not explain when he submitted the documents.  (Doc. 26-29, p. 16, tp. 55).

Ocwen requested bank statements again on August 11, 2015 and asked the Leaks to

provide the statements by August 21, 2015.  (Doc. 26-18).[1]  Each of Ocwen's

requests for documents notified the Leaks that foreclosure proceedings were not

suspended while Ocwen waited for the Leaks to complete their application for

mortgage assistance.  The letters state:

> [W]hile your application remains incomplete we may continue to pursue
> any and all remedies available under the law, including initiating and/or
> advancing the foreclosure sales process on your property.
>
> . . .
>
> If your loan currently is in foreclosure, we may schedule and conduct a
> foreclosure sale in accordance with applicable laws, notwithstanding
> the document due date.

(Doc. 26-16, pp. 2, 5; Doc. 26-17, pp. 2, 5; Doc. 26-18, pp. 2, 5).

On September 17, 2015, Ocwen requested bank statements again and noted

that the Leaks had missed the August 21, 2015 date that Ocwen had set for

submission of the documents.  (Doc. 26-19).  On September 25, 2015, Ocwen asked

the Leaks to provide additional information about their pay stubs by September 27,

2015.  (Doc. 26-20).  Both letters explained that foreclosure proceedings could be

advancing.  (Doc. 26-19, pp. 2, 5; Doc. 20-20, pp. 2, 5).  On September 22, 2015,

---

[1] Mr. Leak testified that he does not recall responding to Ocwen's August 11, 2015 request for
bank statements, but he knows he must have submitted them because he sent Ocwen every
document the company requested "pretty quickly."  (Doc. 26-29, p. 17, tp. 58).

Mr. Leak faxed to Ocwen bank statements for the two preceding months.  (Doc. 26-29, p. 17, tpp. 60-61).

On October 6, 2015, Mr. Leak submitted the additional information that Ocwen had requested regarding pay stubs.  (Doc. 26-29, p. 19, tpp. 66-67; Doc. 29-1).  Later that day, he called Ocwen's customer service hotline to ask about his application.  (Doc. 26-29, pp. 18–19, tpp. 65–69).  On this call, an Ocwen employee told Mr. Leak that the foreclosure sale of the property was scheduled to take place October 7, 2015, the date that Ocwen's attorney had provided to the Leaks on September 10, 2015.  (Doc. 26-13, p. 3; Doc. 26-29, p. 19, tpp. 65–69).  The Ocwen employee stated that he would try to stop the sale, but he could not guarantee that he would succeed.  (Doc. 26-29, p. 19, tpp. 68-69).  Ocwen sent the Leaks a notice dated October 9, 2015 in which Ocwen denied the Leaks' request for a loan modification because the property had "a confirmed sale date within 7 days."  (Doc. 29-2).

On February 19, 2016—four months after the loan was foreclosed and the property was sold—Mr. Leak sent Ocwen via certified mail 12 letters that contained requests for information and notices of error.  (Doc. 26-22, pp. 1–14).  Mr. Leak asked about topics such as the foreclosure sale price, the mortgage servicing file, an itemized payment statement, and loss mitigation options.  (Doc. 26-22, pp. 1-14).  On February 26, 2016, Ocwen sent the Leaks a letter acknowledging receipt of Mr.

Leak's letters.  (Doc. 26-23).  On March 22, 2016, Ocwen sent a substantive response
to the Leaks regarding Mr. Leak's letters.  (Doc. 26-24).  Ocwen explained various
fees and loan-related terms and stated that the foreclosure sale price was the product
of a sale that was conducted "in accordance to the investor guidelines," so Ocwen
could not explain why "the bid amount [was] less than the property market value."
(Doc. 26-24, pp. 1–5).

Several months later in September of 2016, Mr. Leak sent three more letters
that repeated many of his previous written questions concerning the foreclosure sale
of the property.  (Doc. 26-25).  He sent the letters via certified mail and directed
them to:

> Ocwen Loan Servicing, LLC
> Attn:  Research Department

(Doc. 26-25, pp. 3, 4, 6).  Mr. Leak asked Ocwen to send him copies of documents
relating to the mortgage loan.  (Doc. 26-25).  On October 12, 2016, Ocwen sent an
acknowledgment letter in response to the September 2016 letters.  (Doc. 26-26).
Ocwen sent a substantive response on October 21, 2016, repeating that the property
was sold to a third party and stating that Mr. Leak could "request copies of collateral
or certain loan documents that we relied upon in making this determination . . . by
sending a written request to the Research Department at the address mentioned
above," a street address rather than the post office box to which Mr. Leak had mailed
his request for information.  (*Compare* Docs. 26-25 and 26-27).  Ocwen admits that

it did not send the Leaks the documents that Mr. Leak requested.  (Doc. 29-3, p. 23, tp. 83).

The Leaks learned after the foreclosure sale that the payments they had attempted to send to Ocwen through Western Union in April, May, and June of 2014 were undelivered and still in Western Union's accounts.  Ms. Leak testified that Ocwen had accepted the payments but had not retrieved the payments from Western Union, so Western Union returned the payments to the leaks.  (Doc. 26-28, pp. 15–16, tpp. 53–57).  These payments preceded the October 2014 loan modification, (Doc. 26-10) on which the Leaks defaulted, which in turn produced the foreclosure sale at issue.

## III.   ANALYSIS

The Leaks have asserted a federal law claim for violation of the Real Estate Settlement Procedures Act and state law claims for wrongful foreclosure and fraud. The Court examines these claims in turn.[2]

**The Real Estate Settlement Procedures Act**

The Real Estate Settlement Procedures Act, better known as RESPA, is a consumer protection statute that regulates mortgagees, servicers, and other businesses that deal with residential real estate transactions.  In enacting the statute, Congress

---

[2] Initially, the Leaks also asserted state law claims for negligent, wanton, and/or intentional hiring and supervision of employees and agents; negligent or wanton conduct; and invasion of privacy.  The Leaks have voluntarily withdrawn these state law claims.  (Doc. 31, p. 33).

imposed various disclosure and mortgage-related settlement requirements on residential mortgage transactions. *See* 2 U.S.C. § 2601 et seq. Because RESPA is a "remedial consumer-protection statute, [it] should be construed liberally in order to best serve Congress's intent." *Renfroe v. Nationstar Mortg.*, LLC, 822 F.3d 1241, 1244 (11th Cir. 2016).

The Leaks argue that Ocwen violated RESPA in several ways. First, the Leaks contend that Ocwen did not confirm receipt of all of their letters in which they asked questions about their mortgage and the foreclosure. (Doc. 1-1, p. 12, ¶ 37). Relatedly, the Leaks contend that Ocwen did not provide substantive responses to their requests for information within 30 business days of receipt, which the Leaks argue contributes to a "pattern and practice of failing to comply with the Regulations." (Doc. 1-1, p. 12, ¶¶ 38–39). The Leaks also argue that the defendants "have illegally engaged in dual tracking by foreclosing while loss mitigation efforts were underway." (Doc. 1-1, p. 12, ¶ 40). Finally, the Leaks assert that the defendants refused to allow them to pursue loss mitigation. (Doc. 1-1, ¶ 43). None of these RESPA theories is viable.

### 1. Qualified Written Requests

Under RESPA, a borrower may submit a "qualified written request" or QWR to his loan servicer to gather information about his loan. *See* 12 U.S.C. § 2605(e). A qualified written request is written correspondence to a loan provider that identifies the borrower and his account and "includes a statement of the reasons for the belief

of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B)(i)-(ii).

Under RESPA, when a "servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 [business] days." § 2605(e)(1)(A).  No later than 30 business days after receiving the QWR, the servicer must:

    (1)  make appropriate corrections to the borrower's account and provide written notice of the corrections to the borrower;

    (2)  after investigating the borrower's account, provide a written explanation as to why the servicer believes the account does not need correction; or

    (3)  after investigating the borrower's account, provide the requested information or explain in writing why the information cannot be obtained.

*Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1052 (7th Cir. 2018); *see also* § 2605(e)(2).

To prevail on a RESPA claim for failure to respond to a QWR, a plaintiff must demonstrate that "'(1) the defendant is a loan servicer under the statute; (2) the plaintiff sent a qualified written request consistent with the requirements of the statute; (3) the

defendant failed to respond adequately within the statutorily required days; and (4) the plaintiff has suffered actual or statutory damages.'" *McLaughlin v. Ocwen Loan Servicing, LLC*, No. 2:16-cv-02041-AKK, 2018 WL 3126752, at *6 (N.D. Ala. June 26, 2018) (quoting *Correa v. BAC Home Loans Servicing LP*, No. 6:11-CV-1197-ORL-22, 2012 WL 1176701, at *6 (M.D. Fla. Apr. 9, 2012)).  If a plaintiff proves each element, RESPSA provides a right of action for actual damages that the plaintiff suffers as a result of the RESPSA violation and additional damages of up to $2,000, as a district court may allow, for the servicer's pattern or practice of noncompliance with RESPSA.  *See* 2 U.S.C. § 2605(f).  A servicer must commit more than one or two isolated RESPA violations to potentially subject itself to "pattern-or-practice damages." *Lage v. Ocwen Loan Servicing, LLC*, 839 F.3d 1003, 1012 (11th Cir. 2016); *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1247 (11th Cir. 2016).

Because the Leaks submitted their QWRs months after the foreclosure sale was complete and the debt on the Leaks' property extinguished, to prevail on their RESPA claim, the Leaks first must establish that Ocwen was a servicer when they presented their questions to Ocwen.  Some jurisdictions have held that a loan provider ceases to be bound by RESPA requirements following default.  *See, e.g, Daw v. Peoples Bank & Trust Co.*, 5 Fed. Appx. 504, 505 (7th Cir. 2001).  In *Daw*, the Seventh Circuit explained that under RESPA, a servicer must be "responsible for servicing of a loan," 12 U.S.C. § 2605(i)(2), and servicing "means receiving any scheduled periodic

payments from a borrower pursuant to the terms of any loan," 12 U.S.C. § 2605(i)(3). The Seventh Circuit reasoned that when a borrower defaults on a mortgage loan, a loan provider no longer is a servicer under RESPA because the provider does not accept scheduled payments from the borrower and is not responsible for servicing the loan. *Daw*, 5 Fed. Appx. at 505.  Other jurisdictions have held that a loan provider is still a servicer under RESPA following default, even if the provider is not actively receiving payments or otherwise "servicing the loan," but ceases to be a servicer when the loan is foreclosed and the collateral property is sold.  *See Buyea   v.   Select   Portfolio Servicing*,  CASE NO. 9:16-CV-80347, 2016  WL  5904502 at *3  (S.D.  Fla.  Oct. 11,  2016).

The 2013 amendments to Regulation X, the Consumer Financial Protection Bureau regulation that governs a loan provider's obligation to acknowledge and respond to valid QWRs, provide that a servicer must respond to requests for information or notices of error unless the servicer determines that one of several exceptions apply.  12 C.F.R. §§ 1024.35(g) and 1024.36(f).  One exception excuses servicers from responding to QWRs when the requests are untimely, meaning presented more than one year after "the mortgage loan is discharged." 12 C.F.R. §§ 1024.35(g)(iii) and 1024.36(f)(v).  Loans are discharged when the debt and all corresponding liens stemming from the mortgage have been extinguished or released. *See Moody v. PennyMac Loan Services, LLC*, Civil No. 16-cv-21-JL, 2016 WL

11690622, *4 (D.N.H. June 6, 2016) (citing Amendments to the 2013 Mortgage Rules Under the Equal Credit Opportunity Act (Regulation B), Real Estate Settlement Procedures Act (Regulation X), and the Truth in Lending Act (Regulation Z), 78 FR 60382–01, 2013 WL 5428278 (Oct. 1, 2013)). Therefore, Regulation X contemplates that loan providers remain servicers bound by RESPA for one year after foreclosure.

In the absence of binding precedent on the question in this circuit and mindful of the Court's obligation to construe RESPA liberally to best serve Congress's remedial purpose, the Court opts to follow Regulation X. Therefore, though the Leaks' loan had been foreclosed for several months when the Leaks submitted their QWRs, Ocwen still was, by regulation, the servicer for the Leaks' loan when the Leaks presented their QWRs in February and September of 2016. (Doc. 26-22; Doc. 26-25). Ocwen acknowledged receipt of the Leaks' letters on February 26, 2016, and October 12, 2016 respectively. (Doc. 26-23; Doc. 26-26). For purposes of this opinion, the Court assumes that the defendants did not provide adequate responses to the Leaks' inquiries.

Still, the Leaks' QWR claim fails as a matter of law because the damages evidence on which the Leaks rely is not sufficient to enable them to avoid summary judgment. *Lage*, 839 F.3d at 1011; 12 U.S.C. § 2605(f)(1)(A) (stating that borrowers may recover from servicers "any actual damages to the borrower as a result of the [servicer's] failure" to comply with RESPA's requirements). For example, emotional

damages are available for violations of RESPA, *Ranger v. Wells Fargo Bank N.A.*, 757 Fed. Appx. 896, 902 (11th Cir. 2018), but a RESPA plaintiff must present specific evidence to establish that a servicer's violation of RESPSA caused the emotional damages. *McLean v. GMAC Mortg. Corp.*, 398 Fed. Appx. 467, 471 (11th Cir. 2010). A plaintiff's testimony regarding her emotional distress may be sufficient, but "the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a . . . violation occurred supports an award for compensatory damages." *McLean*, 398 Fed. Appx. at 471 (quoting *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005)); *see generally Cousin v. Trans Union Corp.*, 246 F.3d 359, 371 (5th Cir. 2001) (holding that testimony by the plaintiff that he "felt like nobody was listening," he was "very upset, angry," and that he felt like he was "trapped inside of something that you can't get out of" was insufficient to establish emotional damages for a violation of the Fair Credit Reporting Act).

Here, Mr. Leak asserted that he suffered emotional damages while waiting for Ocwen to respond to his first set of QWRs. (Doc. 26-29, p. 31, tpp. 116–17). Mr. Leak testified that he sent his second set of QWRs on September 30, 2016, because he "didn't feel [Ocwen was] cooperating to do anything about getting [his] property back." (Doc. 26-29, p. 31, tp. 116). Mr. Leak felt that he was being ignored by Ocwen.

15

(Doc. 26-29, p. 31, tpp. 116–17).  When his attorney asked if feeling like being ignored caused him stress, Mr. Leak responded, "Oh, God, yeah."  (Doc. 26-29, p. 31, tp. 117).  Mr. Leak went on to say,

> Well, it's kind of like I ran into a brick wall.  You know you're not going to get around it, and you're trying to do everything you can to make it work and you can't. And it's just—I can't describe how it feels.  It's—you know, it's a hopelessness.  And you keep fighting trying to get through it, and you can't, you know. It's just—it's done.

 (Doc. 26-29, p. 31, tp. 117).

While Mr. Leak testified to this emotional distress, there is no evidence in the record that corroborates or elaborates on Mr. Leak's assertion that his stress resulted from Ocwen's alleged failure to respond to his QWRs.  There is no testimony from Ms. Leak that confirms that Mr. Leak suffered stress as a result of Ocwen's failure to comply with RESPA, and Mr. Leak testified that he did not seek any medical treatment throughout this process.  (Doc. 26-29, p. 26, tp. 97).  The record does not enable a factfinder to distinguish between mental anguish that Mr. Leak experienced because of the loss of his family home and mental anguish that he contends he experienced because Ocwen did not respond adequately to his QWRs.[3]  And many of Mr. Leak's

---

[3] Mr. Leak testified that his fear of losing his property "changed everything" in his life, including losing sleep and having negative feelings about his life and relationship with his wife.  (Doc. 26-29, p. 32, tp. 118).  Ultimately losing the property in foreclosure "paint[ed] a big dark picture" for Mr. Leak because he lost the house he intended to live in for the remainder of his life.  (Doc. 26-29, p. 32, tp. 118).  The Leaks testified that losing their property at the foreclosure sale has caused them to suffer stress and

statements concerning his mental anguish are conclusory per *McLean* and *Cousin*. Therefore, the Leaks cannot establish the damages element of their QWR claim.

The Leaks' alternative damages theories fare no better. The Leaks seek repayment of approximately $100 in postage expenses relating to their QWRs. (Doc. 31, p. 28; Doc. 26-22, pp. 15-25; Doc. 26-24, p. 2). Under RESPA, the cost of postage to mail a QWR is not recognized as actual damage because the cost is not suffered "as a result as a failure" to comply with RESPA. *See Baez v. Specialized Loan Servicing, Inc.*, 709 Fed. Appx. 979, 983 (11th 2017). A borrower will incur the postage expense regardless of whether the service provider complies with RESPA, so a borrower may not claim postage as actual damage suffered. *Baez*, 709 Fed. Appx. at 983.

The Leaks also point to fees that Ocwen assessed on their account. (Doc. 31, pp. 28–29). But those fees predate Mr. Leak's QWRs. The fees relate to the 2014 mortgage payments that Ms. Leak sent by means of MoneyGrams through Western Union, payments that Ocwen did not retrieve. (Doc. 26-28, p. 10, tp. 32). Fees that Ocwen assessed before the Leaks submitted a QWR are not damages caused by a RESPA violation.

---

shame resulting in loss of sleep and strain on their marital relationship. (Doc. 26-28, p. 27, tpp. 100–01; Doc. 26-28, p. 29, tpp. 108–09; Doc. 26-29, p. 26, tpp. 94–97).

The Leaks may not recover statutory damages under 12 U.S.C.A. § 2605(f)(1)(B) for a pattern or practice of non-compliance with RESPA because statutory damages are not available to a borrower who cannot establish actual damages. *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 720 (8th Cir. 2018). As the Eighth Circuit held in *Wirtz*, the term "additional" in 12 U.S.C.A. § 2605(f)(1)(B) connotes statutory damages "added" to actual damages. *Wirtz*, 886 F.3d at 720.

For these reasons, the Court will enter judgment for the defendants on the Leaks' QWR RESPA claim.

### 2. Dual Tracking

The Leaks contend that the defendants violated RESPA because the defendants "have illegally engaged in dual tracking by foreclosing while loss mitigation efforts were underway." (Doc. 1-1, ¶ 40). Under RESPA, a loan provider may not seek a foreclosure judgment or conduct a foreclosure sale while a borrow is in a loss-mitigation process if a borrower submits a complete loss-mitigation application at least 37 days before the foreclosure sale. *Cilien v. U.S. Bank Ass'n*, 687 Fed. Appx. 789, 791–92 (11th Cir. 2017); *see also* 12 C.F.R. § 1024.41(g). An application for loss-mitigation is complete when "servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1) *see also* 12 C.F.R. pt. 1024, supp. I, § 41(b)(1) cmt. 1 ("A servicer has flexibility to establish its own application

requirements and to decide the type and amount of information it will require from borrowers applying for loss mitigation options."). A servicer may, in its discretion, review an application that has been incomplete for a significant period of time. 12 C.F.R. § 1024.41(c)(2)(ii).

The Court takes judicial notice that 37 days prior to October 7, 2015, is August 31, 2015. *See* FED. R. EVID. 201(b) (courts may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). Therefore, the Leaks must have submitted a complete application by August 31, 2015, for the dual track prohibitions to apply.

Mr. Leak testified generally that he sent Ocwen all of the documents that the company requested, (Doc. 26-29, pp. 16-17, tpp. 55, 58), but he could not recall when he submitted the documents. On August 11, 2015, Ocwen sent notice to the Leaks that their application was not complete, and Ocwen requested the Leaks' two most recent bank statements. (Doc. 26-18, pp. 1–2). On September 17, 2015, Ocwen requested bank statements again and noted that the Leaks had missed the August 21, 2015 deadline that Ocwen had set for submission of the documents. (Doc. 26-19). Thus, the record establishes that weeks after August 31, 2015, the Leaks still had not

submitted a complete application for loss mitigation.[4]  Consequently, the Leaks' dual-tracking RESPA claim fails as a matter of law.

**State Law Claims**

Because the Court has dismissed the Leaks' claim under RESPA, which is the only federal claim in this case, the Court must determine whether to maintain jurisdiction over the Leaks' state law claims pursuant to 28 U.S.C. § 1367.  Given the age of the case, the Court exercises its discretion to maintain jurisdiction over those claims.  *See West v. City of Albany*, 830 Fed. Appx. 588, 597 (11th Cir. 2020) (holding the district court did not abuse its discretion in retaining supplemental jurisdiction when the case had been pending for five years).[5]

### 1.  Wrongful Foreclosure

The Leaks contend that the foreclosure price of the property was so low compared to offers that the Leaks had received for the property over the years that the price shocks the conscience and that Ocwen must have committed wrongful

---

[4] Additionally, Kevin Flannagan, Ocwen's corporate representative, testified that there were notations after the 37-day deadline in the Leaks' file that the underwriters reviewing the Leaks' application required more documents or clarification about documents already submitted.  (Doc. 29-3).  On September 7, 2015, an Ocwen employee noted on the internal file that he advised Mr. Leak needed to submit bank statements for his application.  (Doc. 29-3, p. 40, tp. 151).  A few days later, there a separate note on the file that some of the documents submitted were illegible.  (Doc. 29-3, p. 43, tp. 162).  On September 25, a note on the file from the underwriting department states "Incomplete documentation, additional information needed regarding pay stubs."  (Doc. 29-3, p. 41, tp. 154).

[5] Alternatively, the Court may exercise jurisdiction over the Leaks' state law claims under 28 U.S.C. § 1332(a) because the citizenship of the parties is completely diverse, and more than $75,000 is in controversy with respect to the Leaks' claims for wrongful foreclosure and fraud.

foreclosure.  Under Alabama law, "[a] mortgagor has a wrongful foreclosure action whenever a mortgagee uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor." *Reeves Cedarhurst Dev. Corp. v. First Am. Fed. Sav. & Loan Ass'n*, 607 So. 2d 180, 182 (Ala. 1992); *see also Jackson v. Wells Fargo Bank, N.A.*, 90 So. 3d 168, 171 (Ala. 2012).  An improper use of the power of foreclosure by a mortgagee, "for such purposes as oppressing the debtor, or serving the purposes of other individuals," may serve as the foundation for a wrongful foreclosure claim.  *Johnson v. Shirley*, 539 So. 2d 165, 168 (Ala. 1988).

Generally, when "'the price realized at the [foreclosure] sale is so inadequate as to shock the conscience, it may itself raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and therefore be sufficient ground for setting the sale aside.'" *Mt. Carmel Estates, Inc. v. Regions Bank*, 853 So. 2d 160, 168 (Ala. 2002) (quoting *Hayden v. Smith*, 216 Ala. 428, 430–31, 113 So. 293 (1927)).  If a plaintiff cannot demonstrate that the foreclosure price for his property is so low as to shock the conscience, he must produce evidence of other circumstances suggesting unfairness, fraud, or mismanagement that warrant setting aside the foreclosure sale.  *Mt. Carmel Estates*, 853 So. 2d at 168.

The Leaks contend that the $93,211.90 foreclosure price for the Cullman property was shockingly low because the City of Good Hope had offered them $250,000 for the property at some point.[6]  The Leaks also provided evidence of a 2008 lease/purchase agreement for $120,000 for the house and one of the 34 acres of property.  (Doc. 26-28, p. 24, tpp. 86–89).  In October of 2014, the Leaks listed the property for sale for $30,000 per acre, (Doc. 26-28, p. 24, tp. 86), but in the summer of 2015, (Doc. 26-15, pp. 16, 23-24), the Leaks estimated the value of their real estate as $160,000, (Doc. 26-15, pp. 13, 20).[7]

The record contains a screenshot of Cullman County online property records for tax year 2015 which indicates that in 2015, the county valued the house on the Leaks' property at $5,200 and the surrounding 30 acres of land at $93,100.  (Doc. 26-31, p. 1).  The Court has confirmed the information from the Cullman County

---

[6] The defendants argue that information concerning the $250,000 offer is inadmissible hearsay that the Court may not consider.  (Doc. 33, p. 8).  The defendants point to the fact that the Leaks' relator spoke to the Mayor of Good Hope and conveyed the offer to the Leaks.  (Doc. 33, p. 8).  The Court is not persuaded.  As counsel for the defendants established in Ms. Leak's deposition, the offer is memorialized in a letter from the Leaks' realtor.  (Doc. 26-28, p. 21, tp. 77).  Mr. Leak demonstrated in his deposition that he has personal knowledge of the City of Good Hope's effort to buy the property.  (Doc. 26-29, p. 21, tpp. 76-77).  At trial, the Leaks could call Mayor Harbison or their realtor to establish the price that the City of Good Hope offered for the property.  (Doc. 26-28, p. 21, tp. 77).  The information about the $250,000 offer for the property years before the foreclosure sale is sufficiently reliable and can be reduced to an admissible format for trial, so the Court may consider the offer as the Court evaluates the defendants' motion for summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (citing *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir.1999)).

[7] The Leaks frequently listed the property for sale for $500,000 or more, but there is no evidence that the Leaks ever received an offer for the property that neared the Leaks' listed price.

website.

(https://cullmanrevenue.us/TaxPayments/Property/Summary?ppin=13837&taxyear
=2015, last visited Jan. 28, 2021).  The Court may take judicial notice of this county
record.  *See Universal Express, Inc., v. S.E.C.*, 177 Fed. Appx. 52, 52 (11th Cir.
2006).

Viewing this evidence in the light most favorable to the Leaks, the Court
accepts that the value of the property in 2015 was $160,000, as the Leaks estimated.
The Court will not use the $250,000 value because the $250,000 offer preceded the
foreclosure date by several years, and there is no objective evidence that tethers the
offer to a formal appraisal.  The $160,000 value that the Leaks assigned to the
property in 2015 is not so far from the appraised value that it seems unrealistic.
While the foreclosure sales price of $93,211.90 is below the Leaks' estimated value
of $160,000, the price is only slightly below the appraised value of the property.
There is nothing shocking or unusual about property being sold at a foreclosure sale
for a price near the appraised value.  *See Perry v. Federal Nat. Mortg. Ass'n*, 100
So. 3d 1090, 1102 (Ala. Civ. App. 2012) (holding that a bid price of 84% of the
appraised value was not too low to shock the conscience).  And the foreclosure sales
price extinguished the Leaks' debt on the property, indicating that the price was not
motivated by ill will or by an effort to take advantage of the Leaks.  There is no
evidence that Ocwen bid on the property at the sale, and a third party with no

connection to either party in this case bought the property at the foreclosure sale. (Doc. 26-21).

Without evidence of malicious intent or unfair conduct on the part of Ocwen, the Leaks' wrongful foreclosure claim fails as a matter of law.  The Court will enter judgment for the defendants on the Leaks' wrongful foreclosure claim.

### 2.  Fraud

The Leaks' fraud claim has evolved since they filed their complaint.  Initially, the Leaks pleaded that Ocwen "represented to the Plaintiffs that the foreclosure sale of October 7, 2015, would not occur" and that Ocwen "suppressed the truth" that the sale would occur on that date.  (Doc. 1-1, p. 13, ¶¶ 52–53).  The Leaks now argue that Ocwen represented to Mr. Leak that the "only remaining documents" needed to consider an application for loan modification were two consecutive bank statements, that he supplied those statements in time to obligate Ocwen to suspend the foreclosure sale, and that Ocwen demanded new documents that Mr. Leak could not provide within the seven days preceding the foreclosure sale so that he could not avoid the sale.  (Doc. 31, pp. 32–33).  The Leaks point to standard language in several loan modification documents that indicates Ocwen will postpone foreclosures when it receives a complete loan modification application.  The documents state:

> If we receive all required documents no later than midnight of the 7th (seventh) business day prior to your scheduled foreclosure sale date,

> we will take actions to suspend the foreclosure sale to evaluate your request for available loss mitigation options, as long as suspension of the foreclosure is permitted by state regulations and approved by your loan's investor.

(Doc. 26-15, p. 3; Doc. 26-16, p. 5; Doc. 26-17, p. 5; Doc 26-18, p. 5; Doc 26-19, p. 5).

Though the facts on which the Leaks rely to establish their fraud claim are sufficiently clear, the Leaks have not cited in their complaint or in their opposition to the defendants' summary judgment motion Alabama law relating to their fraud claim, so they have not identified the fraud theory under which they are travelling. There are several available theories under Alabama law: negligent misrepresentation, intentional misrepresentation, promissory fraud, and fraudulent suppression. *See*, *e.g.*, ALA. CODE § 6–5–101 (fraudulent representation); ALA. CODE § 6–5–102 (suppression of material facts). Because the Leaks' fraud claim concerns a future event – if they supplied the requested documents, Ocwen, upon receipt of the documents, would consider the modification application and suspend the October 7, 2015 foreclosure sale, the claim is one for promissory fraud. Under Alabama law, when a representation involves a promise to take or refrain from an action in the future, a plaintiff must prove that the defendant intended to deceive the plaintiff when the promise was made. *Martin v. American Medical Int'l, Inc.*, 516 So. 2d 640 (Ala. 1987). It is not sufficient to show merely that a promise was not kept. *Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998).

The Leaks have not cited evidence that indicates that Ocwen acted with the intent to deceive them.  Though the documents Ocwen sent the Leaks concerning the Leaks' request for a loan modification contain the language that the Leaks highlight concerning the suspension of a foreclosure sale if certain conditions were met, the documents also contain the following notice:

> **Not all borrowers will qualify for a loan modification or a loss mitigation option:**
>
> We have not yet determined if you are eligible for a loan modification or any other loss mitigation option. You need to submit all required documents in order for us to be able to proceed with our evaluation of your eligibility . . . We reserve the right to verify the information that you submitted, and to request additional information and /or documents to evaluate your eligibility . . . Not all borrowers who submit a completed mortgage assistance request will qualify for a loan modification or any other loss mitigation option.

(Doc. 26-15, p. 4; Doc. 26-16 p. 4; Doc. 26-17 p. 4; Doc 26-18 p. 4; Doc 26-19 p. 4).  Initially, Ocwen set an August 21, 2015 deadline for the Leaks to provide documents to support their application, a deadline months before the October 7, 2015 foreclosure sale date.  Over time, Ocwen requested additional documents and finally, on September 25, 2015, asked the Leaks to provide information about their pay stubs by September 27, 2015.  Had the Leaks met the September 27 deadline, Ocwen would have been able to suspend the foreclosure sale because more than seven days would have remained until the October 7, 2015 foreclosure sale date.  Mr. Leak did not provide the additional information regarding pay stubs until October 6, 2015.

(Doc. 26-29, p. 19, tpp. 66-67; Doc. 29-1).  On this record, there simply is no evidence that Ocwen intended to mislead the Leaks when it explained to them that it would suspend the foreclosure sale if certain conditions were met seven days before the scheduled foreclosure sale date.

Because the Leaks have not offered evidence to prove an essential element of their promissory fraud claim, the Court will enter judgment for the defendants on that claim.

## IV.   CONCLUSION

For the reasons stated above, by separate order, the Court will enter judgment in favor of the defendants.  The Court understands the Leaks' frustration and sadness over losing their family property, but the Leaks have not offered evidence that creates a disputed issue of fact with respect to their federal and state law claims against the defendants.

**DONE** and **ORDERED** this January 29, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE